UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

EDWARD J. ROE,
ANTHONY P. STASIAK,
TIMOTHY J. STEPHEN, and
JONATHAN WALKER,

    Plaintiffs,

v.                                                                                                06-CV-3034

LARRY T. SIMS,
WILLARD O. ELYEA, and
ROGER E. WALKER, JR.,

    Defendants.

## Order

    Plaintiffs allege Defendants were deliberately indifferent to their serious medical needs by failing to treat their Hepatitis C. Plaintiffs also seek class certification to proceed on behalf of all inmates or former inmates who have been victims of this alleged policy of deliberate indifference to the treatment of Hepatitis C. Specifically, Plaintiffs alleges in their Complaint that the IDOC's treatment policy for Hepatitis C is deliberately indifferent because it fails to follow federal guidelines for the treatment of the condition, refuses to timely administer needed liver biopsies, and refuses to allow the administration of proven, effective medication. (Complaint, d/e 1).

    Before the court is Defendants' motion for summary judgment (d/e 21) and Plaintiff's motion to certify class (d/e 11). For the reasons below, the motion for summary judgment is granted in part and denied in part, and the motion to certify class is denied.

    Local Rule 7.1(D)(2)(b) requires a response to summary judgment to list by number each proposed undisputed fact in the motion for summary judgment, and to indicate whether the fact is conceded, disputed or immaterial. A dispute to a proposed fact must be "supported by evidentiary documentation referenced by a specific page." CDIL-LR 7.1(D)(2)(b)(2). The response must also list any additional proposed undisputed facts, supporting the proposed fact by specific page cite to documentary evidence. CDIL-LR 7.1(D)(2)(b)(4). The Rule is strict and specific for a reason--to ensure the parties provide the information necessary for the Court determine exactly what material disputes of fact exist.

    Plaintiffs' response does not list the Defendants' proposed facts by number or otherwise indicate specifically which of those facts are conceded, denied or immaterial. (d/e 25). Plaintiffs do propose their own undisputed facts, citing Dr. Elyea's deposition, but the proposed facts are

in paragraph form, mingled with argument, making it difficult for Defendants to reply and this court to decipher. The Court has therefore adopted Defendants' proposed facts, to the extent they are fairly and accurately supported by their cites to the record. However, the Court has also added its own undisputed facts where necessary to give context and a complete picture of the issues.

*Facts*

*Plaintiff Roe*

1. Plaintiff Roe testified in his deposition the he was first diagnosed with hepatitis in 1976. (Roe Dep. at 24).

2. According to Roe, at that time, it was called serum hepatitis. (Roe Dep. at 20-23).

3. In 1991 Roe was convicted and he was incarcerated until August 2002. (Roe Dep. at 32, lns. 6-10).

4. At his deposition, Roe testified that, in 1998, he was diagnosed as having Hepatitis C. (Roe Dep. at 24).

5. Roe did not see any doctors after his release from prison in August 2002 until he returned to prison in January 2003. (Roe Dep. at 32).

6. Roe was at Logan Correctional Center on a parole violation from approximately January of 2003 through October of 2004. (Roe Dep. at 12).

11. Roe testified that, before returning to prison in January 2003, he was drinking half a case of beer each day. (Roe Dep. at 36-37).

12. Roe admitted that he has used illegal drugs in the past, but he refused to testify about whether he was using drugs before his return to prison in January 2003. Roe Dep. at 38.

13. Since his release in approximately October 2004, Roe has lived in Mattoon, Illinois. (Roe Dep. at 8).

14. Although on probation for burglary at the time of his deposition, Roe has not been in prison since October, 2004. (Roe Dep. at 31).

15. Roe testified that he saw a liver specialist after his release, but the specialist did not perform a liver biopsy or treat Roe's Hepatitis C. (Roe Dep. at 23). Roe testified the specialist said a biopsy was not needed because the specialist could already tell by his exam that Roe had early stages of fibrosis and cirrhosis. According to Roe, the specialist told him to come back when he had insurance to pay for the treatment. Roe testified that he was unable to afford any

2

treatment for his Hepatitis C and that he was trying to get on Social Security to pay for the treatment. (Roe Dep. at 23-24).

*Plaintiff Stasiak*

16. While in the custody of the Department on approximately January 19, 2004, Stasiak was diagnosed as carrying the Hepatitis C virus. (Complaint and Answer, ¶2).

17. Dr. Elyea has reviewed results of the blood work and other medical records for Stasiak while Stasiak was incarcerated. (Dr. Elyea Aff. ¶6).

18. Dr. Elyea avers that, according to Stasiak's medical records, Stasiak has a history of alcohol and drug abuse. (Elyea Aff. ¶7).

19. The results of the blood work indicate that although Stasiak was diagnosed as carrying the Hepatitis C virus following his entry into the custody of the Illinois Department of Corrections, his was also co-infected with the Hepatitis B virus. (Elyea Affidavit, ¶8).

20. There is currently no recommended anti-viral therapy regimen for offenders with Hepatitis B and Hepatitis C co-infections and treatment, if any, should only be initiated with great caution as advised by a specialist. (Elyea Affidavit, ¶9; See also 2003 Federal Guidelines, attached as Exhibit 6 to d/e 22, at 48; 2005 Federal Guidelines, attached as Exhibit 7 to d/e 22 at 36).

21. While incarcerated, Stasiak's enzyme levels, which are used as an indicator in determining the proper course of treatment, improved, though the record does not show what those levels were. (Elyea Affidavit, ¶10).

22. Stasiak was paroled on December 8, 2004.

*Plaintiff Stephen*

23. At his deposition, Plaintiff Stephen testified that he was first diagnosed with Hepatitis C in 2004, while at Logan Correctional Center. (Stephen Dep. at 23).

24. Stephen testified that he was convicted in January 2004 and was sent to Logan Correctional Center for approximately eight months. (Stephen Dep. at 25).

26. Stephen testified that after serving his time at Logan, he was out for approximately eight months, but then went back to prison at Lawrence Correctional Center for approximately nine months. (Stephen Dep. at 25).

27. Stephen has been out of prison since January, 2006. (Stephen Dep. at 25). Stephen

testified that his enzyme levels were monitored while he was in prison. Stephen Dep. at 34.

28. Since his release until the date of his deposition, Stephen had not been treated by any physician for his Hepatitis C, though he is on a waiting list for referral to a specialist, since he does not have insurance. (Stephen Dep. at 10-12; 31).

29. Stephen testified that between his release from prison in January and his deposition on April 17, 2006, he had tried to see a doctor at a free clinic regarding his Hepatitis C twice, once on the week of April 10, 2006, and one other time, approximately two weeks earlier. (Stephen Dep. at 28-29).

31. Stephen admitted that he has a history of intravenous drug use. (Stephen Dep. at 32).

32. Stephen also admitted a history of snorting and smoking drugs. (Stephen Dep. at 32).

33. Stephen refused to answer questions about whether he was using drugs between his release from Logan Correctional Center and his return to prison at Lawrence Correctional Center, however. (Stephen Dep. at 32-33).

34. Stephen also refused to answer questions about whether he had used drugs since his release from Lawrence Correctional Center in January, 2006. (Stephen Dep. at 33).

*Plaintiff Walker*

35. Plaintiff Walker is incarcerated at the Logan Correctional Center. (Walker Dep. At 18).

36. Walker testified that he has been in the physical custody of the Illinois Department of Corrections since June 21, 1994. (Walker Dep. at 19).

37. Walker testified that he was diagnosed with Hepatitis C in October, 2003. (Walker Dep. at 18-19).

38. Walker testified that he was given something for Hepatitis A and B, and has bloodwork performed periodically to check his enzymes, but that he has never received any liver biopsies or treatment for his Hepatitis C. Walker Dep. at 8, 40-45. He also testified that he feels constant fatigue, itching, headaches, sore throat, stomach pains, and his face feels likes "it's on fire." (Walker Dep. at p. 48).

39. Walker testified that to his knowledge, however, no doctor had ever recommended that he have a liver biopsy performed or that he receive chemical treatment for his Hepatitis C. (Walker Dep. at 37). However, Walker also testified that he has been seen only by prison doctors. *Id.*

*Defendant Larry Sims*

40. Larry Sims was the Warden at Logan Correctional Center from approximately October 2002 through November 2004. (Sims Dep. at 4).

41. Sims has no medical training or background. (Sims' Dep. at 5).

42. Sims had no particular knowledge of what Hepatitis C was. (Sims' Dep. at 6).

43. Upon receipt of a grievance regarding medical issues, Sims practice was to contact the health care unit administrative, Dave Huffman who is a registered nurse. (Sims' Dep. at 7; 23).

44. Huffman would research the issue and advise Sims what the situation was so that Sims could respond correctly to the grievance. (Sims' Dep. at 7).

45. Sims spoke with Huffman about grievances from offenders with Hepatitis C and was advised by Mr. Huffman that the medical staff were doing what they were supposed to do for those patients. (Sims Dep. at 15-17).

46. After receiving several grievances related to Hepatitis C, Sims also talked to Dr. Elyea over the phone about the issue. (Sims Dep. at 15-17). Dr. Elyea is the Agency Medical Director for the Illinois Department of Corrections.

47. Dr. Elyea assured Sims that the medical staff at Logan Correctional Center were following the policies and procedures of what medically needs to be done for patients with Hepatitis C. (Sims Dep. at 18).

48. Sims assumed that Mr. Huffman and Doctor Elyea, who were the medical professionals that he relied upon, were telling him the correct things about the treatment of offenders with Hepatitis C. (Sims Dep. at 26).

49. Sims answered "yes" to the question whether he was convinced based upon his conversations with Dr. Elyea and Mr. Huffman that he was doing the right thing. (Sims Dep. at 34).

*The Director*

50. Roger E. Walker, Jr. is the Director of the Illinois Department of Corrections.

51. The Director has no personal knowledge of any correspondence from the Plaintiffs. (Walker Aff. ¶8).

52. The Director had no personal involvement in the treatment or medical care that the

Plaintiffs received. (Walker Aff., ¶12).

53. The Director relies on his staff of licensed health care personnel to provide appropriate health care treatment. (Walker Aff., ¶11).

54. Terri Anderson is a manager of the Office of Inmate Issues. (Anderson Dep. at 3).

55. At her deposition, Anderson testified that the Office of Inmate Issues oversees the grievance process for the Illinois Department of Corrections as the appeal level for the Director. (Anderson Dep. at 4).

56. The Director relies upon the Office of Inmate Issues and does not actually look at the grievances himself. (Anderson Dep. at 10).

57. When the Office of Inmate Issues receives a grievance from an offender alleging that he is not getting appropriate treatment for Hepatitis C, the Office of Inmate Issues' practice is to review the information provided by the facility, including any information provided by the healthcare staff, and in some situations could possibly confer with Dr. Elyea. (Anderson Dep. at 6).

58. If the healthcare staff and Dr. Elyea advise the Office of Inmate Issues that a patient is receiving appropriate treatment, the Office of Inmate Issues does not challenge their advice. (Anderson Dep. at 6-8).

*Federal Bureau of Prison Guidelines on Treatment of Hepatitis C*

59. The Illinois Department of Corrections follows the Federal Bureau of Prison Clinical Practice Guidelines for the Prevention and Treatment of Viral Hepatitis. (Dr. Elyea Dep. p.11-12). The 2003 Federal Guidelines are attached as exhibit #6 to d/e 22.

60. In October 2005, the Federal Bureau of Prisons issued new guidelines related to hepatitis (the "Federal Guidelines"). The 2005 Federal Guidelines are attached as exhibit #7 to d/e 22.

61. At the time of Dr. Elyea's deposition on April 17, 2006, the Illinois Department of Corrections had not yet adopted the 2005 guidelines, and was still following the 2003 federal guidelines. (Elyea Dep at 65).

62. The 2005 federal guidelines were subsequently adopted by the Illinois Department of Corrections, however. (Elyea Aff. ¶12).

63. The Federal Guidelines provide, "The majority of persons with chronic HCV infection are asymptomatic. Chronic HCV infection has an unpredictable course that is frequently characterized by fluctuations in ALT levels that may or may not be associated with

6

significant liver disease. . . . An estimated 10-15% of persons with chronic HCV infection develop progressive fibrosis of the liver leading to cirrhosis. . . .Once cirrhosis develops in persons with chronic HCV infection, the risk of hepatocellular carcinoma (HCC) is about 1-4% per year." (2005 Guidelines at 25; 2003 Guidelines at 39).

64. Treatment decisions are patient specific and proper medical practice necessitates that all cases be evaluated on an individual basis. (2005 Guidelines at 1).

65. There are also different diagnosis and treatment guidelines for patients with acute Hepatitis C and chronic Hepatitis C. Compare the 2005 Guidelines at 21-22 (acute Hepatitis C) and 22-39 (Chronic Hepatitis C). It is not clear what kind Plaintiffs have, but the Court presumes it is the chronic type.

66. The Hepatitis C virus has six genotypes and more than 50 subtypes. (2005 Guidelines at 20; 2003 Guidelines at 35).

67. Genotype 1 is predominant in the United States. (2005 Guidelines at 20; 2003 Guidelines at 35).

68. According to the 2003 Guidelines, inmates with chronic HCV infections "should be periodically evaluated and have ALT levels monitored to help determine if liver biopsy is warranted. . ." (2003 Guidelines at 42). A history and physical exam, along with various other tests that may indicate underlying liver disease, are recommended every six months. (2003 Guidelines at 43). Inmates with "ALT levels" twice normal should have the measurement repeated at least twice over a six month period. Inmates with persistent elevations of twice normal should be referred for liver biopsy. *Id.*

69. "The presence of moderate to severe fibrosis . . . is currently the best marker for determining who should be offered antiviral therapy for Hepatitis C. (2005 Guidelines at 27; 2003 Guidelines at 42 (substantially similar, except added "inflamation and necrosis")).

70. Under the 2003 Guidelines, genotype testing is recommended before antiviral therapy is prescribed. (2003 Guidelines at 44). If it is determined that an inmate needs and is a good candidate for the drug therapy (pegylated interferon and ribavirin), a 24-week course is recommended for genotypes 2 or 3. A 48-week course is recommended for genotype 1. (2003 Guidelines at 46). Weekly monitoring during the first month of treatment is recommended, following monthly monitoring thereafter. (2003 Guidelines at 50). For genotype 1, a test is recommended at 12 weeks to determine if the treatment is working. If the treatment is not working, the Guidelines recommend discontinuing the treatment. (2003 Guidelines at 50). For genotypes 2 and 3, the entire 24-week course is recommended. (2003 Guidelines at 51).

71. The 2005 Guidelines appear to put more emphasis on genotype determination, noting that "HCV genotype markedly affects treatment response. Persons with genotypes 2 or 3 have a

7

76-82 % response rate . . ., compared to persons with genotype 1 who have a 40-45% response rate." (2005 Guidelines at 28). The 2005 Guidelines state that, for genotypes 2 and 3, the drug therapy can be initiated without first doing a liver biopsy, due to the high response rates. A liver biopsy is still recommended for genotypes 1, 4, 5 & 6, because the therapy is less effective in these genotypes. (2005 Guidelines at 29).

72. According to both versions of the Guidelines, inmates with persistently normal ALT levels and who have no other laboratory or clinical evidence of chronic liver disease are unlikely to have or be at risk of severe liver disease. (2003 Guidelines at 42: "inmates with persistently normal ALT levels (at least 3 normal values over a 6 to 12 month period) with no clinical or laboratory evidence of liver disease, are unlikely to have marked liver inflammation or fibrosis."); (2005 Guidelines at 28-29: "Inmates with persistently normal ALT levels (at least 6 normal values evenly distributed over a 24-month period), and who have no other physical or laboratory evidence of chronic liver disease, were infected before the age of 35, and have no history of significant alcohol use, are at extremely low risk of severe liver disease."). Foregoing or deferring liver biopsies is reasonable for these inmates, according to the Guidelines. (2003 Guidelines at 42; 2005 Guidelines at 29).

73. According to the 2005 Guidelines, ALT levels are relevant because "[t]he greater the ALT level, the more likely it is that a person has significant liver disease," but "the decision to obtain a liver biopsy should not be strongly based on ALT levels . . . ." (2005 Guidelines at 28). "A decreased platelet count, an increase in AST/ALT ratio, and a prolonged prothrombin time are the earliest indicators of cirrhosis and portal hypertension and warrant an aggressive evaluation for liver disease." *Id.*

74. The 2005 Guidelines set forth indications for the antiviral therapy, which include "abnormal serum ALT values," "liver biopsy with chronic hepatitis with significant fibrosis," "compensated liver disease," and no contraindications for the drug therapy. (2005 Guidelines at 30).

75. According to the 2005 Guidelines, for inmates needing antiviral therapy, a 12 or 24 week course is recommended for genotypes 2 and 3. 48 weeks is still recommended for genotype 1. (2005 Guidelines at 31).

76. Interferon plus ribaviran is the preferred drug regime for treating chronic Hepatitis C in the absence of contraindications to either drug. (2005 Guidelines at 31; 2003 Guidelines at 45-46).

77. Although it used be a contraindication, a patient's history of alcohol use prior to incarceration, by itself, does not play a role in the decision on whether to give a patient interferon treatment. (Dr. Elyea Dep. at 39).

78. Nonetheless, Hepatitis C virus treatment without abstinence from alcohol is unlikely to be of benefit. (2005 Guidelines at 27; 2003 Guidelines at 48).

79. Moreover, ongoing alcohol or injection drug use are contraindications for interferon therapy. (2003 Guidelines at 71; 2005 Guidelines at 28).

80. The 2003 Guidelines state that inmates on "short-term detention" "should ordinarily not be started on antiviral therapy. Treatment decision should be deferred until the inmate is sentenced and redesignated or released." (2003 Guidelines at 41).

81. The 2005 Guidelines are more specific on duration of confinement. They indicate that short-term inmates who cannot complete the course of treatment and laboratory and clinical monitoring should ordinarily not be started on antiviral therapy, because "[t]he potential for interrupted antiviral therapy for hepatitis C places the inmates at risk for a number of undesirable outcomes, including treatment failure if the course of treatment is not completed, and adverse effects from medications if the inmate does not receive the required laboratory and clinical monitoring upon release or transfer." (2005 Guidelines at 26).

82. The side effects and adverse reactions to therapy can include severe fatigue, weight loss, rage, confusion, depression, neuropsychiatric disorders, bone marrow suppression, thyroid dysfunction, dyspnea, headache and palpitations. (2005 Guidelines at 32; 2003 Guidelines at 47).

*Dr. Elyea*

83. As Agency Medical Director for the Illinois Department of Corrections, Dr. Elyea has responsibility for establishing the medical policies used in treating offenders in the Department's custody. (Dr. Elyea Dep., p. 11, attached to d/e 25).

84. In addition to following the Federal Guidelines for treating inmates with Hepatitis C, Dr. Elyea has implemented a policy that an inmate will not be referred to a specialist unless their enzyme levels are twice the normal level on two separate occasions, have no contraindications for treatment, and have at least one year left to serve on their sentence. (Dr. Elyea Dep. at 29-34).

85. In his deposition, Dr. Elyea said, "That's correct," to the question, "But you have made a determination that no matter what a patient's condition, no matter what the enzymes show, if he has a year or less to serve in the Department of Corrections he will not receive treatment." (Dr. Elyea Dep. at 34). There is also no genotype-testing done if an inmate has less than one year left to serve. (Dr. Elyea Dep. At 57).

86. Dr. Elyea testified that the one-year policy was implemented to ensure that inmates receiving the 48-week treatment received the full treatment and could be monitored for side effects and possible complications while taking it. (Dr. Elyea Dep. at 35-36).

87. The one-year policy is across-the-board for all genotypes of Hepatitis C, even though the treatment for genotypes 2 and 3 lasts only twelve or twenty-four weeks, not 48 weeks (Dr. Elyea Dep. at 56-59). The reason given by Dr. Elyea for treating all genotypes alike is that, "we

9

want to make sure before we do any work-up that every single individual who is going to be treated for hepatitis C at least has a year left." (Dr. Elyea Dep. At 58-59). Dr. Elyea also testified that the one-year rule applied to all genotypes, not so much for medical reasons, but for the sake of simplicity. (Dr. Elyea Dep. at 62).

*Analysis*

I. <u>Summary Judgment will be granted to Defendants Walker and Sims, as they are entitled to rely on Dr. Elyea's medical expertise in setting IDOC policy on the medical treatment of inmates with Hepatitis C.</u>

In the context of medical treatment, "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . . Perhaps it would be a different matter if [non-medical staff] ignored [an inmate's] complaints entirely, but we can see no deliberate indifference [where the staff] investigated the complaints and referred them to medical providers. . ." *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005).

As the above facts show, the treatment for Hepatitis C is not within the layman's understanding. Defendants Walker and Sims have no medical training. They reasonably relied on the medical training and experience of Dr. Elyea, a board certified family practice physician for over 30 years, to make the decisions regarding what treatments inmates with Hepatitis C should receive. Accordingly, summary judgment is mandated for Defendants Walker and Sims.

II. <u>The injunctive claims of Plaintiffs Roe, Stasiak and Stephen must be dismissed because they have been released from prison.</u>

"When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers." *Al-Alamin v. Gramely*, 926 F.2d 680, 685 (7th Cir. 1991). "Evidence of past wrongs alone is insufficient to merit equitable relief." *Stewart v. McGinnis*, 5 F.3d 1031, 1037 (7th Cir. 1993)((inmate not entitled to equitable relief where he was no longer housed in prison where alleged violations had occurred), *citing* City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 (1983)(possibility that police would illegally choke plaintiff again insufficient to show immediate danger).

Since Roe, Stasiak and Stephen are all out of prison, the constitutional violation is history, as to them at least. Plaintiffs do not argue otherwise. Accordingly, their claims for injunctive relief will be dismissed.

III. <u>Inmate Roe's claims based on events before his incarceration in January 2003 are barred by the statute of limitations. However, Roe's claims arising from his incarceration in 2003-2004 remain, as there is insufficient information in the record to determine whether Dr. Elyea's policy was deliberately indifferent to Roe's serious medical needs.</u>

The statute of limitations that applies to the plaintiff's Section 1983 claims is the two-year Illinois statute governing tort cases. *Evans v. City of Chicago*, 434 F.3d 916, 934 (7th Cir. 2006). Roe was released from prison in August 2002 and did not file this lawsuit until September 2005. Accordingly, the Court agrees with Defendants that the statute of limitations bars Roe's claims regarding events that occurred before his 2002 release from prison. Plaintiffs do not argue otherwise. However, those events may still be relevant and admissible evidence to support Roe's remaining claims based on his treatment in 2003-2004.

As to Roe's claim that Dr. Elyea's one year policy was deliberately indifferent to Roe's serious medical needs, the Court notes that cost may be considered when determining medical care for inmates. *See Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004)("it is difficult to generalize about the civilized minimum of public concern necessary for the health of prisoners except to observe that this civilized minimum is a function both of objective need and cost. *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir.1999). 'The lower the cost, the less need has to be shown, but the need must still be shown to be substantial.'" ). The legal inquiry is not whether the cost of the treatment was a factor in the decision, but whether the treatment decision ultimately chosen "demonstrate[s] an absence of professional judgment." *Collignon v. Milwaukeee County*, 163 F.3d 982 (7th Cir. 1998).

Generally speaking, it seems a stretch to infer deliberate indifference from a general policy declining to initiate a 48-week drug regimen if an inmate has less than 48 weeks left on his sentence. The 2005 Guidelines themselves recommend against starting drug therapy that cannot be finished, Guidelines which Plaintiffs appear to concede establish a minimum baseline of competent care (though not the best or most current care). Plaintiffs do not dispute Defendants' assertion that interrupting treatment before it can be finished poses a host of medical risks and practical problems. Plaintiffs also do not offer evidence to support their assertion that Dr. Elyea has a policy to administer liver enzyme tests at longer intervals than recommended by the Guidelines. Nor do Plaintiffs offer any evidence of their assertion that treatment should be started upon the first elevated test.

In any event, whether Dr. Elyea's one-year policy was deliberately indifferent as to all inmates with Hepatitis C is not a question now before the Court. The question now before the Court is whether the policy amounted to deliberate indifference to *Roe's* serious medical needs. On the present record, there is not enough information to make that determination. For example, no one offers what kind of Hepatitis C Roe has, what genotype it is, the particular levels of Roe's enzymes now or in prison, whether Roe had other indicators of liver disease in prison, when he was seen by physicians, and what those physicians did, if anything, in response to Roe's concerns. There are no affidavits from treating physicians and no medical records. All the Court can surmise on the present record is that Roe has Hepatitis C, that he says he had elevated levels while in prison in 2003-2004, and that he got no further treatment or testing. In short, the record leaves too many questions unanswered. Defendants' motion does not demonstrate the absence disputed issues of material fact.

IV.     Similarly, there is insufficient information to grant summary judgment to Defendants on

the claims of Stephen, Walker and Stasiak.

Defendants come close to winning summary judgment against Stasiak, as Stasiak has both Hepatitis B and C, a condition for which there is apparently no standard recommended treatment. However, though Stasiak's enzyme levels apparently improved, no one says what those levels were, or whether Stasiak had any other indicators of liver disease. As with the other plaintiffs, there is no evidence on what medical diagnosis or treatment Stasiak received, no affidavits from treating physicians and no medical records. Similarly, there is very little information at all as to Plaintiff Stephen or Plaintiff Walker. Walker is apparently still incarcerated, so why the one-year rule would apply to him is unclear.

In sum, the Court cannot tell what each Plaintiff's condition was or what medical decisions were made, much less whether those decisions were within the accepted range of medical judgment. The Court realizes that the treating physicians are not defendants, but the plaintiffs assert they received no testing or treatment because of Dr. Elyea. As there is not enough information in the record about how Dr. Elyea's policy affected these Plaintiffs. Nor have Defendants shown they are entitled to qualified immunity, namely because the facts of the case are not sufficiently developed.

V.      Plaintiffs have not demonstrated the commonality, typicality or adequacy required for class certification.

Fed. R. Civ. P. 23 states:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims of defenses of the class, and 4) the representative parties will fairly and adequately protect the interests of the class.

Plaintiffs assert "[t]he Class can easily be described as those inmates within the Department of Corrections who at some point in time during their incarceration had Hepatitis C and elevated liver enzyme levels but received no treatment for that Hepatitis." However, as the Guidelines demonstrate, determining the appropriate treatment for an inmate with Hepatitis C is not easily described or determined. It seems to the court on the current record that inmates' experiences with Hepatitis vary widely. Elevated liver enzymes are only one factor in the determination of whether a liver biopsy should be performed, and many different factors affect whether drug therapy should be initiated. History and physicals, as well as other clinical and lab tests are important, along with determining the existence of contraindications. Here, the Court cannot even tell if Plaintiffs were viable candidates for drug therapy treatment, be it 12, 24 or 48 week.

In sum, the record does not support Plaintiffs' assertion that "the position of the

Defendant is identical to each and every Plaintiff . . .," (d/e 11, p.5)., or that the questions of law and fact share enough commonality and typicality for class certification, at least on the present record. Nor have Plaintiffs demonstrated that they adequately represent the class of inmates aggrieved by Dr. Elyea's policy. Plaintiffs do not even offer their own expert testimony about what their condition is or what care they should have received in prison. Accordingly, the Court is not persuaded that class certification is appropriate.

IT IS THEREFORE ORDERED that:

1) Defendants' motion for summary judgment is granted in part and denied in part (d/e 21) as follows:

    a) Summary judgment is granted in favor of Defendants Walker and Sims, who are terminated from this case.

    b) Summary judgment is granted to Defendants on Plaintiff Roe's claims arising from events that occurred before his incarceration in 2003, on the grounds that those claims are barred by the statute of limitations.

    c) Summary judgment is granted to Defendants on the claims for injunctive relief by Plaintiffs Roe, Stasiak and Stephen.

    d) The motion for summary judgment is otherwise denied.

2) Plaintiffs' motion for class determination is denied (d/e 11).

3) A separate text order will enter setting this case for a final pretrial conference and trial.

Entered this ____28th____ Day of _____March_____, 2007.

                        **s\Harold A. Baker**

                        HAROLD A. BAKER
                        UNITED STATES DISTRICT JUDGE